## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALAN HOLMES, : 
                :
        Plaintiff, :       CIVIL NO. 4:07-CV-1477
                :
        v. :       Hon. John E. Jones III
                :
CAPTAIN CHIARELLI, *et al.*, :
                :
        Defendants. :

## MEMORANDUM

November 17, 2010

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

This *pro se* civil rights action was initiated by Plaintiff Alan Holmes ("Plaintiff" or "Holmes"), an inmate currently confined at the United States Penitentiary - Canaan ("USP Canaan") in Waymart, Pennsylvania, by filing a Complaint under the provisions of 42 U.S.C. § 1983. (Doc. 1.) At the time of filing on August 13, 2007, Plaintiff was an inmate at the Lackawanna County Prison in Scranton, Pennsylvania.

Presently before the Court is a Motion for Summary Judgment filed on behalf of Defendants on April 30, 2010. (Doc. 54.) For the reasons set forth herein, the Motion will be granted.

## I. PROCEDURAL BACKGROUND

In his Complaint Plaintiff names as Defendants Captain Chiarelli, and Correctional Officers Paul DeSando and Mr. Zelinski, all of whom were employed by the Lackawanna County Prison during the relevant time period. (*See* Doc. 1 at 1, 2.) Plaintiff alleges that Defendants DeSando, Zelinski, and Chiarelli subjected him to excessive force. He provides the details of an incident that allegedly occurred on March 6, 2007 that began when he was given a food tray with onions on it. Holmes claims that, when he complained to Defendant Zelinski because he is allergic to onions, Zelinski told him to eat around them. (*Id.* at 2 § IV ¶ 1.) When he asked to see a "white shirt," Zelinski refused and told him to go to his cell. (*Id.*) He alleges that Defendant DeSando then approached and grabbed him by his shirt, punched him in his cell, and slammed the door in his face. (*Id.*)

Plaintiff alleges that DeSando continued to harass him, and that on May 22, 2007, DeSando told him to move out of his cell to another cell for no reason. (*Id.* ¶ 2.) When Plaintiff asked why, DeSando told him to move "because I told you to move." (*Id.*) When Plaintiff asked for a "white shirt," DeSando allegedly grabbed his arm and twisted it behind his back, slammed him against the wall with his knee, and handcuffed him tightly, and then took him with other officers and assaulted him by

kicking and punching him with handcuffs and shackles on in Delta T-Block. (*Id.*)

Plaintiff next alleges that, on June 26, 2007, he participated in a "food strike" in his Unit because of a lack of food, and that the "Riot C.O.'s" came in his cell wearing riot gear and assaulted him while he was shackled and handcuffed. (*Id.* 3.) He also claims that Defendant Chiarelli came up to him and kicked him between his legs, causing unbearable pain. (*Id.*)

Holmes also alleges that, on July 20, 2007, he overheard Defendant Zelinski talking about him to another inmate, and when Holmes asked Zelinski why he was talking about him, Zelinski stated, "Holmes I can talk about you to anybody," and advised him to "Shut up before I open that cell and teach you a lesson." (*Id.*) Holmes claims that Zelinski then entered his cell and choked him until he couldn't breathe. (*Id.*)

In a separate page attached to his form Complaint, Holmes makes a statement dated August 7, 2007, which he submits under penalty of perjury. (*Id.* at 4-5.) In his statement, he makes the following additional[1] general allegations: (1) he has been placed in the Restricted Housing Unit ("RHU") "for no reason at all, just because they

---

[1]In his additional statement, Holmes also repeats some of his allegations from the "Statement of Claim" section of his Complaint as to his excessive force claim, and therefore, to avoid redundancy, those allegations are not repeated here.

are having a bad day"; (2) the conditions of confinement generally in the Lackawanna County Prison violate his Eighth Amendment right to be free from cruel and unusual punishment; (3) "I am being starved in this county facility. The food is unappetizing and unwholesome, poorly prepared and often infested with insects."; (4) his outgoing mail does not leave the facility, and sometimes, he does not receive his mail either; and (5) he has been denied access to the telephone in order to call his attorney and family members. (*Id.*)

Service of the Complaint was directed by Order dated August 27, 2007. (Doc. 6.) On October 10, 2007, the process receipt and return as to each Defendant was docketed showing that service on Defendants had been accomplished on September 28, 2007, and thus an Answer to the Complaint was due on October 18, 2007. (*See* Doc. 7.) On November 26, 2007, Plaintiff filed a "Declaration for Entry of Default." (Doc. 10.) Therefore, by Order dated December 3, 2007, we directed Defendants to show cause within twenty (20) days why Plaintiff's request for default should not be granted. (*See* Doc. 11.) Defendants failed to respond to the December 3, 2007 Order. On February 27, 2008, Plaintiff filed a second request for default. (Doc. 19.) By Order dated May 7, 2008, we granted Plaintiff's request, and default was entered against all Defendants. (Doc. 22.)

On May 23, 2008, Plaintiff filed a Motion for Default Judgment. (Doc. 25.) By Order dated February 5, 2009, we directed Defendants within twenty (20) days to show cause why a default judgment should not be entered in Plaintiff's favor. (Doc. 29.) Thereafter, on February 24, 2009, counsel entered an appearance on Defendants' behalf (Doc. 32)[2], and a Response was filed, which we construed as a Motion to Set Aside Default pursuant to Fed. R. Civ. P. 55(c). (Doc. 33.) By Order dated March 4, 2009, we granted the Motion to Set Aside Default, denied Plaintiff's Motion for Default Judgment, and directed them within fifteen (15) days to respond to Plaintiff's Complaint. (Doc. 34.)

On March 17, 2009, Defendants filed an Answer to the Complaint. (Doc. 35.) By Order dated April 14, 2009, we established case management deadlines for this case, including deadlines for the completion of discovery, the submission of discovery-related motions, and the filing of dispositive motions. (Doc. 36.) These deadlines subsequently were extended several times, and the final deadline established for the submission of dispositive motions was April 30, 2010. (*See* Doc. 51.) On that date, the instant Motion for Summary Judgment (Doc. 54) was filed on Defendants' behalf, along with a Statement of Material Facts (Doc. 55), a supporting brief (Doc.

[2]Counsel subsequently withdrew his appearance on August 5, 2009 (Doc. 39), following the entry of appearance on July 31, 2009 by current counsel for Defendants. (Doc. 37.)

56), and supporting exhibits (Docs. 55-2 through 55-9).

On May 14, 2010, the day his opposition to the Motion Summary Judgment was due to be filed, Plaintiff mailed correspondence to the Court requesting a copy of his docket sheet and the exhibits (Doc. 13) to his Complaint. The correspondence was docketed in this action on May 17, 2010. (*See* Doc. 57.) In his letter, Plaintiff stated that he required a copy of the exhibits in order to represent himself. (*See id.*) At the time he filed the exhibits to his Complaint on December 21, 2007, Plaintiff indicated in his cover letter that he had been unable to make a copy of them because he was being denied access to the law library where the copy machine was located. (*See* Doc. 13 at 1.)

The Clerk of Court immediately sent a copy of Plaintiff's docket sheet to him. (*See* Doc. 57, Remark.) However, the Clerk was not able to send Plaintiff a copy of his exhibits from the CM/ECF System because several of the exhibits did not scan well and were unreadable.

The original exhibits then were retrieved from the case file. Because most of the exhibits are on carbon paper, the writing on the documents is difficult to read in its original form. However, the Clerk of Court re-scanned the exhibits that were not readable on the CM/ECF System (*see* Docs. 13-2, 13-3, Exs. B, G, N, Q) and,

pursuant to our June 1, 2010 Order, mailed a copy of all of the exhibits to Plaintiff (Docs. 13, 13-2, 13-3). (Doc. 58.)

In our June 1 Order, we also construed Plaintiff's letter as a request for an extension of time to file his opposition to Defendants' Motion for Summary Judgment, the request was granted, and he was directed to file his opposition, including an opposing brief and statement of material facts as required by Middle District of Pennsylvania Local Rule ("LR") 56.1, on or before June 15, 2010. (*Id.*) On June 16, 2010, Plaintiff filed a brief in opposition to the instant Motion for Summary Judgment. (Doc. 59.) Holmes did not file a separate statement of material facts as he was directed to do in our June 1 Order.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its

burden, the burden then shifts to the non-moving party to show that there is a genuine

issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a

sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and

a factual dispute is "material" only if it might affect the outcome of the action under

the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on

allegations or denials in its own pleadings; rather, its response must . . . set out

specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-

moving party "cannot rely on unsupported allegations, but must go beyond pleadings

and provide some evidence that would show that there exists a genuine issue for trial."

*Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in

briefs "are not evidence and cannot by themselves create a factual dispute sufficient to

defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of

Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable

inferences drawn therefrom must be viewed in the light most favorable to the non-

moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about

the facts or the proper inferences that a factfinder could draw from them. *Peterson v.*

*Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

## III. DISCUSSION

### A. Undisputed Facts

Because Holmes failed to file a separate statement of material facts controverting the statement filed by Defendants, as he specifically was directed to do in this Court's June 1, 2010 Order (Doc. 58), all material facts set forth in Defendants' Statement of Material Facts ("SMF") (Doc. 55) will be deemed admitted. *See* LR 56.1.[3] Defendants' Statement and supporting exhibits (Docs. 55-2 through 55-9, Doc. 56-3)[4] establish the following undisputed facts material to the instant Motion:

#### 1. Facts Relating to Disciplinary Proceedings

---

[3]LR 56.1 provides, in relevant part, as follows: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

[4]In support of the instant Motion, Defendants have submitted the following exhibits: excerpts from Plaintiff's clinical file (Doc. 55-3); excerpts from Plaintiff's medical file (Doc. 55-4); the Affidavit of Captain Frank Chiarelli (Doc. 55-5); the Affidavit of Correctional Officer Paul DeSando (Doc. 55-6); the Affidavit of Correctional Officer Peter Zelinski (Doc. 55-7); the Affidavit of Assistant Deputy Warden David Langan (Doc. 55-8); the Affidavit of Louis P. Cipriano (Doc. 55-9); and a New York Times article containing a reference to the guidelines of the federal Department of Agriculture as to the recommended daily caloric intake for active and sedentary men (Doc. 56-3).

It is undisputed that Holmes' clinical file, maintained in the ordinary course of business by the Lackawanna County Prison, contains a number of misconduct reports and incident reports which document the instances during which Holmes came into physical contact with correctional officers while incarcerated at the Lackawanna County Prison. (Doc. 55, SMF, ¶ 2; Doc. 55-3, Dfts. Ex. B, Excerpts from Pltf.'s Clinical File.)

The record establishes that, on or about December 27, 2006, approximately three (3) months before Holmes' initial allegation of mistreatment, he was issued a misconduct report by virtue of his refusal to obey a direct order to gather his belongings because he was being transferred to another cell. (Doc. 55 ¶ 3; Doc. 55-3 at 2, Ex. B-1, 12/27/06 Misconduct Report.) It is undisputed that, as a result of that refusal to obey a direct order, Holmes was found guilty of the violation of rules and regulations, and was issued a sentence of fourteen (14) days in disciplinary custody. (Doc. 55 ¶ 3; Doc. 55-3 at 3, Ex. B-2, 1/1/07 Disciplinary Hearing Board ("DHB") Report.)

Holmes' clinical record reflects that, on March 6, 2007, he was cited for the following violations: Class I (14) Interfering with a Staff Member; Class I (24) Abusive Language to Staff; Class I (25) Creating a Disturbance; and Class II (9)

Insulting Language.  (Doc. 55 ¶ 4; Doc. 55-3 at 4, Ex. B-3, 3/6/07 Misconduct Report.) The incident report documents the circumstances surrounding Holmes' allegation in the instant Complaint that he was mistreated when he complained about onions in his food.  (Doc. 55 ¶ 4 (citing Complaint, Doc. 1 at 2 IV 1).)  The report, dated March 6, 2007, documents Holmes' refusal to lock up in his cell which, along with his abusive language and failure to comply with orders, resulted in the issuance of a misconduct report to him for violation of the aforementioned prison regulations.  (*Id.*)

It is undisputed that a disciplinary hearing was conducted on March 8, 2007. (*Id.*)  The DHB Report reflects that Holmes was found guilty of the charges of Interfering with a Staff Member and Disobeying a Direct Order.  (*Id.*; Doc. 55-3 at 5, Ex. B-4, 3/8/07 DHB Report.)

Holmes' clinical file establishes that, on May 22, 2007, he was ordered against a wall by Defendant Correctional Officer Paul DeSando for purposes of being handcuffed.  (Doc. 55 ¶ 5; Doc. 55-3 at 6, Ex. B-5, 5/22/07 Incident Report.)  Holmes began to resist by pulling his arms away from Defendant DeSando, and, in twisting his arms and kicking his legs, Holmes struck DeSando in the groin area.  (*Id.*)  After he was successfully handcuffed, Holmes began to pull away from the officers who were escorting him, and the officers had to call for additional support in order to carry

11

Holmes into the cell to which he was being transferred.  (*Id.*)  During this incident,

Holmes also threatened Defendant DeSando.  (*Id.*)  As a result of this incident, Holmes

was cited with the following violations: Class I (3) Assault; Class I (13) Threats; Class

I (24) Abusive Language; Class II (1) Creating a Disturbance; Class II (17) Insolence;

and Class II (21) Disobeying an Order.  (Doc. 55 ¶ 5; Doc. 55-3 at 7, Ex. B-6, 5/22/07

Misconduct Report.)

As a result of his conduct on May 22, 2007, a disciplinary hearing was

conducted on May 24, 2007, at which time Holmes was found guilty of all charges set

forth in the Misconduct Report except Insolence.  (Doc. 55 ¶ 6; Doc. 55-3 at 8, Ex. B-

7, 5/24/07 DHB Report.)  He was sentenced to seventy (70) days in the RHU.  (*Id.*)

Holmes' clinical file establishes a record of verbal harassment against Defendant

DeSando.  (Doc. 55 ¶ 7.)  An incident report was completed on June 25, 2007, in which

it was documented that Holmes had asked one of the correctional officers on T-Block,

where he was housed at the time, about where DeSando works and where he has been.

(*Id.*; Doc. 55-3 at 9, Ex. B-8, 6/25/07 Incident Report.)  On June 25, 2007, Correctional

Officer Jackson heard Holmes indicate to Defendant DeSando that "he is ready for

round two"; Jackson also heard Holmes indicate that "I know you live in Dunmore and

I'll f***ing kill you and your family."  (Doc. 55 ¶ 7; Doc. 55-3 at 10, Ex. B-9, 6/25/07

Incident Report by Jackson.)  As a result of the threats that Holmes made against

DeSando, a misconduct report was issued in which Holmes was charged with

violations of Regulations 13(a) and (b), which prohibit an inmate from making threats

against a correctional officer.  (Doc. 55 ¶ 7; Doc. 55-3 at 11, Ex. B-10, 6/25/07

Misconduct Report.)

It is undisputed that, on the following day, June 26, 2007, Holmes was involved

in an incident in which he participated in the flooding of his cell.  (Doc. 55 ¶ 8; Doc.

55-3 at 12, Ex. B-11, 6/26/07 Misconduct Report.)  The Misconduct Report issued on

that date establishes that Holmes and his cellmate incited other inmates to follow their

actions.  (*Id.*)  As a result, several cells in the Delta Unit became flooded, and this

flooding extended to other cell blocks in the prison.  (*Id.*)  Holmes was charged with

the following violations: Class I (12) Riot; Class I (13a) Threats; Class I (14)

Interfering with a Staff Member; Class I (25) Creating a Disturbance; Class I (33)

Attempt; Class I (3) Assault; Class I (15) Misuse/Destruction of County Property;

Class II (11) Sanitary Violations; and Class II (21) Disobeying a Direct Order.  (*Id.*)

On the following day, June 27, 2007, Correctional Officer DeRiggi completed a

report in which he documented Holmes' attempted assault of correctional staff, which

occurred after he was directed to stop kicking his cell door because it was causing a

disturbance by setting off the door alarm. (Doc. 55 ¶ 9; Doc. 55-3 at 13, Ex. B-12, 6/27/07 Incident Report.) Correctional Officer Blume also documented Holmes' conduct during this incident. (Doc. 55 ¶ 9; Doc. 55-3 at 14, Ex. B-13, 6/27/07 Incident Report by Blume.) In his Report, Blume indicated that, when he approached Holmes' cell, the windows of the cell were covered with wet toilet paper. (Doc. 55-3 at 14.) Holmes refused several orders to remove the toilet paper from the windows in order to allow staff members to handcuff him through the wicket of the cell door. (*Id.*) Upon entry into Holmes' cell, Holmes and his cell mate attempted to use a mattress to block the doorway. (*Id.*) Blume further documents that Holmes and his cellmate were taken to the ground and "restrained using minimal force and then removed to new cells." (*Id.*) Blume also notes in his Report that Nurse Jackie M. was on the Unit to check Holmes for injuries and found none. (*Id.*)

As a result of Holmes' conduct on June 27, 2007, he was charged with the following violations: Class I (A-4) Assault; Class I (B-2) Threatening Staff; Class I (D-9) Disrupting Order in the Prison; Class I (B-1) Fighting; and Class I (D-1) Abusive Language. (Doc. 55 ¶ 10; Doc. 55-3 at 15, Ex. B-14, 6/27/07 Misconduct Report.) The Misconduct Report corroborates that, after being taken to the ground, Holmes was evaluated by medical staff. (*Id.*)

Two disciplinary hearings were conducted on June 29, 2007. Following the first hearing, Holmes was found guilty of the charge of making threats against a correctional officer as to his threats against DeSando. (Doc. 55 ¶ 11; Doc. 55-3 at 16, Ex. B-15, 6/29/07 DHB Report.) Holmes was sentenced to twenty-one (21) days in the RHU. (*Id.*) Following the second hearing on the charges brought against Holmes stemming from the June 27, 2007 incident during which he and his cellmate attempted to block access to their cell[5], Holmes was found guilty of the charges of Assault, Threats, Abusive Language, and Disruption. (Doc. 55 ¶ 12; Doc. 55-3 at 17, Ex. B-16, 6/29/07 DHB Report.) Holmes was sentenced to eighty-four (84) days in the RHU. (*Id.*)

On July 10, 2007, an Incident Report was completed which documented that Holmes was complaining about portions of his food and was reported to have indicated he, "has no choice but to raise it up a notch" and "it's going to take him swinging at an officer while out of his cell to get him moved to federal prison." (Doc. 55 ¶ 13; Doc.

---

[5]In paragraph 12 of their Statement of Material Facts, Defendants state that the second hearing that was held was on the charges stemming from Holmes' participation in the flooding of his cell. (*See* Doc. 55 ¶ 12.) However, a review of the DHB Report shows that the charges of which he was found guilty following the second hearing on June 29, 2007 were entered following the June 27 incident where Holmes and his cellmate attempted to block access to their cell. (*See* Doc. 55-3 at 17, 6/29/07 DHB Report; Doc. 55-3 at 15, 6/27/07 Misconduct Report.)

55-3 at 18, Ex. B-19[6], 7/10/07 Incident Report.)

On July 20, 2007, an Incident Report was prepared stating that, on that date at 22:05 hours, Defendant Zelinski entered Holmes' cell block to determine why Holmes was pressing his call button. (Doc. 55 ¶ 14; Doc. 55-3 at 19, Ex. B-20.) Zelinski approached Holmes' cell, and as soon as Holmes' cell door was opened, he became "verbally hostile" and he pushed Zelinski. (*Id.*) Correctional Officer Ratchford then called a code blue and assisted Zelinski in restraining Holmes until backup arrived. (*Id.*)

In her Incident Report documenting the July 20, 2007 incident, Correctional Officer Tirva-Smith noted that she witnessed Holmes being escorted out of the T-Block, and she observed that he did not appear to have any injuries. (Doc. 55 ¶ 14; Doc. 55-3 at 20, Ex. B-21, Incident Report by Tirva-Smith.) However, Correctional Officer Zelinski was treated in the Medical Unit for a scratch to the top of his left hand and an abrasion to his left forearm. (*Id.*)

Correctional Officer Robert Mazzino also documented the July 20, 2007 incident. (Doc. 55 ¶ 15; Doc. 55-3 at 21, Ex. B-22, Incident Report by Mazzino.) In

---

[6]A break in the sequence of numbering of Defendants' exhibits occurs after Exhibit B-16, and therefore, while Defendants refer to Exhibit B-17 in Paragraph 13 of their Statement of Material Facts, the actual Exhibit is labeled as "B-19," and therefore, we refer to it as such here.

his Report, Mazzino indicated that he witnessed Holmes physically lash out at Officer Zelinski and that Zelinski was attempting to restrain Holmes and asking him to calm down and cooperate. (Doc. 55-3 at 21.) Mazzino reported that Holmes continued to be uncooperative and combative. (*Id.*)

In addition, Officer Ratchford completed an Incident Report documenting the July 20, 2007 incident. (Doc. 55 ¶ 15, Doc. 55-2 at 22, Ex. B-23, Incident Report by Ratchford.) In his Report, Ratchford indicated that, when Zelinski opened Holmes' cell door, Holmes became "extremely aggressive with Officer Zelinsk[i] for no apparent reason." (Doc. 55-2 at 22.) Ratchford's Report also documents that Officer Zelinski appeared to be "de-escalating the situation", but Holmes then attacked Zelinski by pushing him. (*Id.*) As a result of Holmes' conduct on July 20, 2007, he was charged with the following violations: Class I (3) Assault; Class I (10) Fighting; Class I (13) Threats; Class I (14) Interfering with Staff; and Class I (25) Creating a Disturbance. (Doc. 55 ¶ 15; Doc. 55-3 at 23, Ex. B-24, 7/20/07 Misconduct Report.)

### 2.      Facts Relating to Medical Evaluation and Treatment

The portion of Holmes' medical file, as maintained by Correctional Care,

Incorporated, relevant to the instant proceedings demonstrates that, on June 27, 2007, Holmes was approached by the nursing staff for purposes of evaluating him after the flooding incident in which he was involved. (Doc. 55 ¶ 16; Doc. 55-4 at 1, Ex. C-1, Medication or Treatment Notes.) The notations made by medical staff indicate that, at approximately 9:30 a.m. on June 27, 2007, Holmes made three (3) refusals of a medical evaluation. (Doc. 55-4 at 1.)

The relevant portion of Holmes' medical file also reflects that, on July 20, 2007, after Holmes' confrontation with Correctional Officer Zelinski, the nursing staff did not observe any injuries on Holmes. (*Id.*) However, the notes indicate that Zelinski was treated for the scratch and abrasion he sustained. (*Id.*)

### 3.    Facts Relating to Defendant Chiarelli

Defendants have submitted as Exhibit D in support of the instant Motion the Affidavit of Defendant Captain Frank Chiarelli. (Doc. 55-5.) The undisputed testimony set forth in that Affidavit establishes the following:

1.    I am employed at the Lackawanna County Correctional Facility.

2.    I have read the Complaint filed by Alan Holmes on August 13, 2007.

3.    With respect to the allegations made in the Complaint by Alan Holmes that on any occasion I

18

physically assaulted him, those allegations are entirely false. At no time did I assault Alan Holmes.

4.    At no point in time have I ever had any physical altercation with Alan Holmes.

5.    There have been occasions where I have had to contact a cell extraction team to remove Mr. Holmes from his cell for misconduct. Any time Holmes was removed from his cell, the removal was performed in order to maintain the peace and order at the Lackawanna County Correctional Facility and, in my judgment, tailored to meet necessary penological objectives in maintaining order at the facility.

6.    At no time have I ever seen any correctional officer retaliate against Holmes or strike him. The only time that I have ever seen any officer put his hands on Holmes was in order to remove Holmes from his cell or because Holmes failed to respond to a command to leave his cell in an orderly fashion.

7.    As a Captain at the Correctional Facility, I do not actively participate in cell extractions but only contact the cell extraction team to remove an inmate from his cell if the inmate is noncompliant.

8.    I have reviewed the record of disciplinary misconducts which have been documented by the staff of the Lackawanna County Correctional Facility and verify that these disciplinary misconduct documents are true and correct.

(Doc. 55-5, Chiarelli Aff.)

### 4.     Facts Relating to Defendant DeSando

Defendants have submitted as Exhibit E in support of the instant Motion the Affidavit of Defendant Correctional Officer Paul DeSando.  (Doc. 55-6.)  The undisputed testimony set forth in that Affidavit establishes the following:

> 1.     I only had physical contact with Mr. Holmes on one occasion. I had been directed by my Sargent, Rosheen Kennedy Vrabel, to remove Mr. Holmes from his cell for purposes of being relocated to another area of the prison.
>
> 2.     At the time that I was removing Mr. Holmes from his cell, I asked him to face the wall so he could be hand-cuffed. As Mr. Holmes had one hand placed behind his back to be hand-cuffed, he turned around and kicked me in the groin without provocation.
>
> 3.     After Mr. Holmes kicked me in the groin, I took him to the ground along with Correctional Officer Jason Jervis. In taking Mr. Holmes to the ground, I used the minimum amount of force necessary to place him under control so that he could be handcuffed. At no time did I assault Mr. Holmes nor inflict unnecessary or unreasonable force.
>
> 4.     I had no other physical altercations with Alan Holmes.

(Doc. 55-6, DeSando Aff.)

### 5.     Facts Relating to Defendant Zelinski

Defendants have submitted as Exhibit F in support of the instant Motion the

20

Affidavit of Defendant Correctional Officer Peter Zelinski. (Doc. 55-7.) The

undisputed testimony set forth in that Affidavit establishes the following:

1.  I have read the allegations of the Complaint filed against me by Alan Holmes on August 13, 2007.

2.  I verify that I have had only one physical altercation with Alan Holmes.

3.  The circumstances of this physical altercation are as follows: I responded to the Delta Unit, T-Block, which is a disciplinary custody unit and upon hearing a great deal of noise, opened the cell door where Alan Holmes was housed. Upon entering the cell Holmes attacked me by pushing me and I took steps to bring Holmes under control and to restore order in the Delta Unit. Correctional Officers Robert Mazzino and Jason DiBileo both then came in to the cell where Holmes was located in order to assist me and to bring Holmes under control.

4.  At no time did I kick, punch or strike Holmes in any way. I simply took the appropriate posture to bring Holmes under control after he had pushed me.

5.  At no point during the time that I took Holmes to the ground did he sustain any injury. He never sought medical attention nor did he sustain any bruising, sprains, or injury of any type.

6.  The entire altercation consisted of taking Holmes to the ground so that he could be placed under control.

(Doc. 55-7, Zelinski Aff.)

**6.      Facts Relating to Food Service at Lackawanna County Prison**

Holmes has attached a statement to his Complaint under penalty of perjury dated

August 7, 2007, in which he sets forth, *inter alia*, complaints with respect to the

portions and quality of the food at the Lackawanna County Prison.  (*See* Doc. 1 at 4-5.)

The undisputed testimony of record, as provided in the Affidavit of Assistant Warden

David Langan (Doc. 55-8, Ex. G) establishes that, during Holmes' period of

incarceration, the Lackawanna County Prison had a comprehensive dietary plan in

place which called for an average of 3600 calories daily.  The sworn testimony of

Langan, Deputy Warden of Operations, establishes the following:

> 1.      I am currently employed at the Lackawanna County
>         Prison as an Assistant Deputy Warden.
>
> 2.      In 2007, which is the time frame referenced in
>         Plaintiff's Complaint, I was the Assistant Warden of
>         Operations at the Lackawanna County Prison.
>
> 3.      In my capacity as the Assistant Warden of Operations,
>         part of my job responsibility entailed the coordination of
>         food service at the Lackawanna County Prison. Part of
>         my job responsibilities entailed ensuring that Aramark
>         Services, the contractor retained by the prison to provide
>         food service for all inmates in 2007 complied with the
>         Request for Proposal ("RFP") published by the prison for
>         the food service contract.
>
> 4.      I have reviewed the allegations of Plaintiff's

22

Complaint with respect to the inadequacy of the meal plan at the prison and upon my information, personal knowledge and belief that the County had a contract with Aramark Services to provide food services to all inmates incarcerated at the prison. Attached to this Affidavit is a copy of the Request for Proposal (Exhibit "A") which would have had to been submitted by Aramark in order to obtain a contract with the County. As indicated in the Request for Proposal (Exhibit "A" at pg. 10, ¶ (e)(1)), each inmate was to receive a weekly average of 3600 calories per day, and every menu is certified by a registered dietitian (Exhibit "A" at pg. 11, ¶4. "Menu & analysis certified by R.D.")(a)).

5.     The kitchen facilities at the Lackawanna County Prison are inspected from time to time for both the cleanliness of the kitchen space itself and also to ensure that sanitary procedures are utilized at all times.

6.     Based upon my knowledge, information and belief, the menu specifications incorporated into the RFP (Exhibit "A" to this Affidavit) were always followed by Aramark during the time frame that Alan Holmes was a prisoner at the Lackawanna County Prison.

(Doc. 55-8, Langan Aff.)  The menu specifications are set forth in the RFP attached as

Exhibit "A" to Langan's Affidavit.  (Doc. 55-8 at 14-35.)

### 7.     Facts Relating to Mail Service at the Lackawanna County Prison

In his Complaint, Holmes has attached a narrative summary under date of

August 7, 2007, in which he complains that his "mail does not leave to facility

sometimes and I don't receive mail niether [*sic*]."  (Doc. 1 at 4.)  With respect to

Holmes' allegation in this regard, the undisputed record evidence, and specifically the undisputed testimony set forth in the Affidavit of Louis P. Cipriano (Doc. 55-9, Ex. H) demonstrates that neither Holmes' outgoing nor incoming mail was tampered with by correctional staff at the Lackawanna County Prison. The undisputed testimony of Cipriano, who during the relevant time frame of 2007, was responsible for the delivery, pickup, and search of inmate mail, demonstrates the following:

1. I, Louis P. Cipriano, am currently employed at the Lackawanna County Prison and have been so employed since July of 2004.

2. I have reviewed the allegations of the Plaintiff's Complaint with respect to the Plaintiff's claims that he was not given his mail while incarcerated at the Lackawanna County Prison and that his outgoing mail was not deposited in the United States Postal Service.

3. During the year 2007 and specifically for the times alleged in the Complaint, I was responsible for the delivery, pickup and search of mail for contraband.

4. In the year 2007, the policy of the Lackawanna County Prison was that mail delivered to the facility was distributed to the inmates within 24 hours. Typically, the mail would be delivered to inmates in 3-6 hours.

5. The policy with respect to "legal mail", that is, mail frm [*sic*] an attorney or the Court, would only

24

be opened by the inmate in the presence of a correctional officer. This policy also applied to any certified mail.

6.    Based upon my personal knowledge, I never tampered with Mr. Holmes' mail and to my knowledge, every letter he deposited for mailing was forwarded to the postal service by the employee of the postal service who delivered the mail to the Lackawanna County Prison on that given day. There was no mail service on Sundays.

7.    Based upon my personal knowledge, Mr. Holmes received all letters that were mailed to him on the days when I worked and his mail was never tampered with either by myself or any other correctional officer or employee at the Lackawanna County Prison.

(Doc. 55-9, Cipriano Aff.)

**B.    Analysis**

**1.    Excessive Force**

Holmes alleges that Defendants Chiarelli, DeSando, and Zelinski used excessive force against him during incidents on March 6, May 22, June 26, and July 20, 2007. (*See* Doc. 1 at 2 § IV.)  The Eighth Amendment prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  The Eighth Amendment is the primary source for protection of an inmate who has been convicted and is serving his sentence and claims that officials used excessive and unjustified force.  *See Whitley v.*

*Albers,* 475 U.S. 312, 327 (1986); *Brooks v. Kyler,* 204 F.3d 102, 106 (3d Cir. 2000).

When a plaintiff asserts an excessive force claim under the Eighth Amendment, "the

central question is 'whether force was applied in a good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm.'" *Brooks,* 204 F.3d at

106 (quoting *Hudson v. McMillan,* 503 U.S. 1, 7 (1992)). To survive summary

judgment, therefore, the evidence must "support a reliable inference of wantonness in

the infliction of pain." *Whitley,* 475 U.S. at 322.[7] Although there is no minimum

threshold regarding the extent of an injury required to establish excessive force[8], the

prohibition of cruel and unusual punishment nonetheless "necessarily excludes from

constitutional recognition *de minimus* uses of physical force, provided that the use of

force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at

9-10.

Courts consider many factors in determining whether an official used excessive

force in violation of the Eighth Amendment's prohibition of cruel and unusual

---

[7]Such an inference of wantonness can be made, for example, when the evidence demonstrates that a guard intends to harm an inmate. *Brooks,* 204 F.3d at 106 (citing *Sampley v. Ruettgers,* 704 F.2d 491, 495 (10th Cir. 1983)).

[8]"[T]he absence of significant resulting injury is not a *per se* reason for dismissing a claim based upon alleged wanton and unnecessary use of force against a prisoner." *Brooks,* 204 F.3d at 109. The extent of the injury, however, does "provide[ ] a means of assessing the legitimacy and scope of the force" considering the attendant circumstances. *Id.*

punishment. These factors include:

> (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that as used'; (3) 'the extent of the injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'

*Brooks*, 204 F.3d at 106 (quoting *Whitley,* 475 U.S. at 321).

We find that there is no record evidence upon which a reasonable juror could find a violation of Holmes' Eighth Amendment rights. The undisputed factual record demonstrates the need for the application of force against Holmes in each of the instances where he claims that excessive force was improperly utilized. In each instance, it is apparent that the threats and physical force originated with Holmes rather than with members of the correctional staff and that Holmes resisted efforts by staff to diffuse the situation. Based on these facts, correctional staff reasonably perceived a threat posed by Holmes to their personal safety and to the maintenance of order in the prison, and it is apparent that only the minimal amount of force was used to contain the threat and restore safety both for correctional staff and other inmates. In addition, it is apparent from the undisputed facts, including Holmes' medical records, that Holmes did not sustain any physical injury during the incidents on June 27 and July 20, 2007, and that, in fact, it was Defendant Zelinski who sustained injuries during the incident

on July 20, 2007 that required treatment by medical staff. (*See* Doc. 55 ¶¶ 9, 10, 14-17.) Moreover, Holmes' blanket statement in his opposition brief that "Defendants did apply unnecessary force on Plaintiff on several occasions" (*see* Doc. 59 at 4 ¶ 2) is merely a reiteration of the unsupported allegations in his Complaint and thus is insufficient to defeat summary judgment by showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2); *Jones*, 214 F.3d at 407. As such, Holmes' excessive force claim fails, and Defendants are entitled to judgment as a matter of law as to that claim.

### 2.    Placement in the RHU

In his statement attached to his Complaint submitted under penalty of perjury, Holmes claims that he had been sent to the RHU "for no reason at all, just because they are having a bad day." (*See* Doc. 1 at 4.) We construe Holmes' claim to be that he was not afforded due process before he was found guilty of misconduct charges and sanctioned with placement in the RHU.

The Fourteenth Amendment prohibits the states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists and, if so, the next

step is to define what process is mandated to protect it. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). A protected liberty interest may be created either by the Due Process Clause itself or by state law. *Id.* Due process requirements apply only when the prison officials' actions impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Conversely, there can be no due process violation where there is no protected liberty interest. Courts within the Third Circuit, applying *Sandin* in various actions, have found no protected liberty interest implicated by placement in disciplinary custody. *See Torres v. Fauver,* 292 F.3d 141, 150-51 (3d Cir. 2002) (because prisoners can reasonably anticipate transfer to disciplinary custody, placement in segregation as a disciplinary sanction did not implicate a protected liberty interest); *Griffin v. Vaughn,* 112 F.3d 703, 706-08 (3d Cir. 1997) (no liberty interest in avoiding fifteen (15) month placement in administrative custody because said confinement was not atypical); *Smith v. Mensinger,* 293 F.3d 641, 645, 654 (3d Cir. 2002) (seven (7) months of disciplinary confinement did not implicate liberty interest).

We first observe that the undisputed factual record in this case establishes that, contrary to Holmes' assertion in his statement attached to his Complaint, he was not placed in the RHU "for no good reason at all". Rather, he was afforded due process in the

form of a disciplinary hearing on each of the charges he faced and was placed in the RHU as a sanction only after the Disciplinary Hearing Board reached a verdict that he was guilty. Specifically, the undisputed factual record shows that, following hearings on misconduct charges on January 1, 2007, March 8, 2007, May 24, 2007, and June 29, 2007 (two hearings), Holmes was found guilty and sentenced to fourteen (14) days, twenty-one (21) days, seventy (70) days, twenty-one (21) days, and eighty-four (84) days in the RHU, respectively. (*See* Doc. 55, Dfts. SMF, ¶¶ 3, 4, 6, 11, 12.)

In applying the standard set forth above, we find that Holmes' claim that his placement in the RHU violates due process is without merit because even his longest placement of eighty-four (84) days in the RHU does not implicate a protected liberty interest. *See Griffin*, 112 F.3d at 706-08; *Smith*, 293 F.3d at 645, 654. Holmes' statement in his opposition brief that his "Complaint does allege 'extreme deprivations' that satisfying [*sic*] objective component and known harm that satisfying [*sic*] subjective component" (*see* Doc. 59 at 4 ¶ 3), is merely a reiteration of the unsupported allegations in his Complaint, and therefore is insufficient to defeat summary judgment by showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2); *Jones*, 214 F.3d at 407. Accordingly, Holmes' due process claim with regard to his placement in the RHU fails, and Defendants are entitled to judgment as a matter of law as to this claim.

### 3. Food Service

In his statement attached to his Complaint submitted under penalty of perjury, Holmes alleges that he was "starved" in the Lackawanna County Prison, and that "the food is so unappetizing and unwholesome, poorly prepared and often infested with insects. I go to sleep very hungry every night and wake-up to another unwholesome 'tray.'" (*See* Doc. 1 at 4.)

As stated above, the Eighth Amendment protects inmates from cruel and unusual punishment. U.S. Const. amend. VIII. In the non-medical context, the Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S. 517, 526-527 (1984). To state an Eighth Amendment claim based on prison conditions, a plaintiff must meet two (2) requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the official "must have a sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, (1994). An objectively, sufficiently serious injury is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, water, shelter. *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981); *see also Tillman v. Lebanon Cnty. Corr. Facility,*

221 F.3d 410, 419 (3d Cir. 2000).

Moreover, prisoners are entitled to a nutritionally adequate diet. *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980). The Eighth Amendment requires that prison officials serve "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Id.* "A substantial deprivation of food may be sufficiently serious to state a conditions of confinement claim under the Eighth Amendment." *Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002).

In the instant case, the undisputed factual record establishes that, during the relevant time frame, the Lackawanna County Prison had a contract in place to provide each inmate in its custody with an average daily caloric intake of 3,600 calories. (CITE Langan Affidavit.) Defendants have submitted evidence to the effect that the Guidelines of the Federal Department of Agriculture recommend a minumum of 2,800 calories a day for active men, and 2,200 calories per day for sedentary men. (*See* Doc. 56-3, Dfts. Ex. B, Fox Butterfield, States Putting Inmates on Diets to Trim Budgets, N.Y. Times, Sept. 30, 2003.) Although Plaintiff asserts in his opposition brief that a reasonable jury would be able to find that he suffered nutritional deprivation because inmates in the "SHU Unit"[9]

---

[9]We assume that, in this context, Holmes is using the term "SHU" (Special Housing Unit)
(continued...)

at the Lackawanna County Prison were fed "smaller portions of food than regular population inmates and administrative custody inmates as well" (*see* Doc. 59 at 4 ¶ 4), he has not submitted any evidence to prove his assertion. Therefore, he has failed to controvert the evidence submitted by Defendants establishing that the Lackawanna County Prison offered a nutritionally adequate diet to *all* inmates during the relevant period that provided above the minimum caloric level recommended by the Federal Department of Agriculture.

In addition, Defendants have submitted evidence through the testimony of Assistant Warden Langan establishing that the kitchen facilities at the Lackawanna County Prison are inspected periodically both for cleanliness of the kitchen and to ensure that sanitary procedures are used at all times. (*See* Doc. 55-8, Langan Aff., ¶ 5.) Plaintiff has not submitted any evidence to contradict this testimony. Accordingly, Defendants are entitled to judgment as a matter of law as to Plaintiff's claims regarding food service during the time that he was confined at the Lackawanna County Prison.

### 4. Phone Access and Mail Service

In his statement attached to his Complaint submitted under penalty of perjury, Holmes alleges that "I am also being denied access to the phone so I can call my lawyer

---

[9](...continued)
interchangeably with RHU.

and family.  My mail does not leave the facility sometimes and I don't receive [*sic*] mail niether [*sic*].  When I do the postage date is several weeks prior to the day I receive it." (*See* Doc. 1 at 4.)   We will examine Holmes' claims regarding access to the phone and mail service in the context of a First Amendment denial of access to the courts claim.

Under the First and Fourteenth Amendments, prisoners retain the right of access to the courts.  *See Lewis v. Casey,* 518 U.S. 343, 346 (1996).  However, a prisoner asserting a denial of access to courts claim must satisfy the constitutional standing requirement by alleging an actual injury.  *Lewis,* 518 U.S. at 349.  To meet this requirement, a plaintiff must show that the actions of the prison officials hindered the prisoner's efforts to pursue a nonfrivolous claim.  *See Monroe v. Beard,* 536 F.3d 198, 205 (3d Cir. 2008); *Christopher v. Harbury,* 536 U.S. 403, 415 (2002).

Further, "the injury requirement is not satisfied by just any type of frustrated legal claim."  *Lewis,* 518 U.S. at 354.  The right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims", and thus the right is limited to safeguarding prisoners' ability "to attack their sentences, either directly or collaterally, and in order to challenge the conditions of their confinement."  *Id.* at 355. "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly

constitutional) consequences of conviction and incarceration." *Id*.

In the instant case, Holmes has failed to submit any evidence showing that his alleged lack of access to the telephone or the disruptions to his mail service resulted in an "actual injury." As to the latter claim, Holmes failed to submit any evidence to controvert the Affidavit of Louis P. Cipriano, the member of the Lackawanna County Prison staff who, during the relevant time frame of 2007, was responsible for the delivery, pickup, and search of inmate mail, stating that neither Holmes' outgoing mail nor incoming mail was tampered with or confiscated. Holmes' blanket assertions in his opposition brief that "Plaintiffs [*sic*] mail was tampered with on numerous occasions and interfered with by prison officials" (*see* Doc. 59 at 4 ¶ 5), and "Plaintiff has satisfied allegations that inability to use the telephone resulted in 'actual injury'" (*see id.* ¶ 6), merely reiterate the unsupported allegations of his Complaint, and as such, are insufficient to show a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e)(2); *Jones*, 214 F.3d at 407. Accordingly, Holmes' claims with regard to phone access and mail service fail, and Defendants are entitled to judgment as a matter of law as to these claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 54) will be granted, and judgment will be entered in their favor. An appropriate Order will

enter.